UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
BERKLEY INSURANCE COMPANY,

Plaintiff,

-against-

FG-PH CORP.; ARISTA MECHANICAL HVAC, INC.; CEGF & G PLUMBING CORP.; 1815 LINDEN, LLC; EFSTRATIOS GEORGELIS a/k/a CHARLIE GEORGELIS; MICHAEL PANAGIOTOPOULOS; POLYXENI PANAGIOTOPOULOS; CARLOS CASSIUS a/k/a CARLOS CASSIUS-LINVAL; CARMEN CASSIUS a/k/a CARMEN CASSIUS-LINVAL; SPYROS PANAGIOTOPOULOS; GEORGIA PANAGIOTOPOULOS KARAGOUNIS; IVISDENIA CASSIUS; CELESTE CASSIUS; MICHAEL PANAGIOTOPOULOS IRREVOCABLE TRUST; POLYXENI PANAGIOTOPOULOS IRREVOCABLE TRUST; JOHN DOE TRUSTEES 1-10; and JOHN DOE TRANSFEREES 1-20,

Defendants.
---------------------------------------------------------------x

Civil Action No.:

**COMPLAINT WITH JURY DEMAND**

Plaintiff Berkley Insurance Company, by and through undersigned counsel, and for its Complaint alleging causes of action against FG-PH Corp., Arista Mechanical HVAC, Inc., CEGF & G Plumbing Corp., 1815 Linden, LLC, Efstratios Georgelis a/k/a Charlie Georgelis, Michael Panagiotopoulos, Polyxeni Panagiotopoulos, Carlos Cassius a/k/a Carlos Cassius-Linval, Carmen Cassius a/k/a Carmen Cassius-Linval, Spyros Panagiotopoulos, Georgia Panagiotopoulos Karagounis, Ivisdenia Cassius, Celeste Cassius, Michael Panagiotopoulos Irrevocable Trust, Polyxeni Panagiotopoulos Irrevocable Trust, John Doe Trustees 1-10, and John Doe Transferees 1-20 (collectively “Defendants”), states and alleges as follows:

## PRELIMINARY STATEMENT

1. This is an action to avoid and recover fraudulent conveyances and voidable transfers made by nine judgment debtors who are jointly and severally liable to Berkley Insurance Company on a $14,452,044.22 federal judgment (plus post-judgment interest thereon), dated March 27, 2025, obtained in *Berkley Insurance Company v. FG-PH Corp., et al.*, No. 1:22-cv-02109-DG-TAM (E.D.N.Y.) ("Underlying Lawsuit"), and to recover property and money transferred to insider transferees, including the judgment debtors' children and trusts for their benefit.

2. The text of the judgment is as follows: "**ORDERED AND ADJUDGED** that Judgment is entered in favor of Plaintiff Berkley Insurance Company in the amount of $10,500,000 plus prejudgment interest in the amount of $3,952,044.22 for a total of $14,452,044.22 against Defendants FG-PH Corp., Arista Mechanical HVAC, Inc., CEGF&G Plumbing Corp., 1815 Linden LLC, Efstratios Georgelis, Michael Panagiotopoulos, Polyxeni Panagiotopoulos, Carlos Cassius, and Carmen Cassius jointly and severally; and that this case is closed." (Underlying Lawsuit, DE 60, pp. 1-2.)

3. The nine judgment debtors named in the judgment ("Judgment Debtors"), who are also defendants herein, lost their appeal against that judgment.

4. The transfers alleged below include transfers of New York real estate, foreign real estate, cash, retirement proceeds, and other assets for no consideration or less than reasonably equivalent value, while Berkley Insurance Company held contingent, unmatured, matured, and ultimately judgment claims against the judgment debtors arising from indemnity obligations and bonded construction losses.

5. The Judgment Debtor defendants and their insider transferees engaged in a pattern of transfers to children, family members, and family trusts; retained use or benefit of transferred property; failed to keep or produce complete financial records; moved funds through joint accounts; transferred funds internationally; and continued to dissipate assets despite Berkley Insurance Company's demand for indemnity and entry of judgment in the Underlying Lawsuit.

6. Berkley Insurance Company seeks avoidance of the transfers, attachment or turnover of transferred assets and proceeds, money judgments against transferees and beneficiaries to the extent of value received, an accounting, injunctive relief prohibiting further transfers, attorneys' fees and costs, and all other relief available under the New York Debtor and Creditor Law, the Federal Rules of Civil Procedure, New York Civil Practice Law and Rules ("CPLR") Article 52, and the Court's equitable powers.

## PARTIES

7. Plaintiff Berkley Insurance Company ("Berkley") is an insurance and surety company and is the judgment creditor in the Underlying Lawsuit. Berkley is a corporation organized and existing under the laws of the State of Delaware with its principal office at 475 Steamboat Road, Greenwich, Connecticut 06830.

8. Defendant FG-PH Corp. ("FG-PH") is a corporation organized and existing under the laws of the State of New York with its principal office in New York, upon information and belief at 54-42 46th Street, Maspeth, Queens, New York 11378. FG-PH is a Judgment Debtor in the Underlying Lawsuit.

9. Defendant Arista Mechanical HVAC, Inc. ("Arista"), is a corporation organized and existing under the laws of the State of New York with its principal office in New York, upon

information and belief at 54-42 46th Street, Maspeth, Queens, New York 11378. Arista is a Judgment Debtor in the Underlying Lawsuit.

10. Defendant CEGF & G Plumbing Corp. ("CEGF & G") is a corporation organized and existing under the laws of the State of New York with its principal office in New York, upon information and belief at 54-42 46th Street, Maspeth, Queens, New York 11378. CEGF & G is a Judgment Debtor in the Underlying Lawsuit.

11. Defendant 1815 Linden, LLC ("1815 Linden"), is a limited-liability company organized and existing under the laws of the State of New York with its principal office in New York, upon information and belief at 54-42 46th Street, Maspeth, Queens, New York 11378. Defendant 1815 Linden is a Judgment Debtor in the Underlying Lawsuit with interests in real property at or associated with the address 18-15 Linden Street, Ridgewood, Queens, New York 11385. The members of 1815 Linden are only citizens of New York. 1815 Linden is not a citizen of Delaware or Connecticut.

12. Defendant Efstratios Georgelis, also known as Charlie Georgelis, is an individual Judgment Debtor in the Underlying Lawsuit who is a resident of Flushing, Queens County, in the State of New York. Upon information and belief, he owned or controlled interests in FG-PH, CEGF & G, 1815 Linden, and related entities, and controlled or possessed records concerning their assets and transfers.

13. Defendant Michael Panagiotopoulos is an individual Judgment Debtor in the Underlying Lawsuit and is a resident of Elmhurst, Queens County, in the State of New York. He is a former officer, shareholder, member, owner, or beneficial owner of several Judgment Debtor companies and related entities, including FG-PH, Arista, 1815 Linden, FG-PH Development, Inc.

("FG-PH Development," a New York corporation), and 46th Street Property Corp. (a New York corporation).

14. Defendant Polyxeni Panagiotopoulos is an individual Judgment Debtor in the Underlying Lawsuit and a resident of Elmhurst, Queens County, in the State of New York. She is married to Michael Panagiotopoulos and transferred assets to the Panagiotopoulos children (Spyros and Georgia) and trusts as alleged below.

15. Defendant Carlos Cassius, also known as Carlos Cassius-Linval, is an individual Judgment Debtor in the Underlying Lawsuit and a resident of Fresh Meadows, Queens County, in the State of New York. He is married to Carmen Cassius and transferred assets directly or indirectly to the Cassius children (Ivisdenia and Celeste) as alleged below.

16. Defendant Carmen Cassius, also known as Carmen Cassius-Linval, and also known in the Dominican Republic as Carmen Nunez, is an individual Judgment Debtor in the Underlying Lawsuit and a resident of Fresh Meadows, Queens County, in the State of New York. She is married to Carlos Cassius and transferred assets directly or indirectly to the Cassius children (Ivisdenia and Celeste) and others as alleged below.

17. Defendant Spyros Panagiotopoulos ("Spyros") is the son of Michael and Polyxeni Panagiotopoulos, an insider transferee, trustee or beneficiary of trusts created by Michael or Polyxeni Panagiotopoulos, and a recipient or beneficiary of transfers alleged below. He is a resident of the County of Queens in the State of New York.

18. Spyros is also, with Georgia Panagiotopoulos Karagounis, a co-trustee of both of the Trust Defendants.

19. Defendant Georgia Panagiotopoulos Karagounis ("Georgia" or "Georgia Panagiotopoulos") is the daughter of Michael and Polyxeni Panagiotopoulos, an insider transferee,

trustee or beneficiary of trusts created by Michael or Polyxeni, and a recipient or beneficiary of transfers alleged below. Upon information and belief, she resides or is located in Greece and owns or claims interests in property transferred by Michael or Polyxeni. She is a citizen of New York or Greece or both.

20. Georgia is also, with Spyros, a co-trustee of both of the Trust Defendants.

21. Defendant Ivisdenia Cassius is the daughter of Carlos and Carmen Cassius and an insider transferee or beneficiary of transfers alleged below. She is a resident of the State of New York and owns or claims an interest in real property located at 28 Park World East, Valley Stream, New York.

22. Defendant Celeste Cassius is the daughter of Carlos and Carmen Cassius and an insider transferee or beneficiary of transfers alleged below. She is a resident of the State of New York and owns or claims an interest in an apartment located at 1901 Madison Avenue, Apartment 522, New York, New York.

23. Defendant Michael Panagiotopoulos Irrevocable Trust ("MP Trust") is an insider transferee or beneficiary of transfers made by Michael Panagiotopoulos, including transfers concerning 54-46 46th Street and related assets. Upon information and belief, its only trustees are Spyros and Georgia. The identities of any other trustees will be amended when discovered.

24. Defendant Polyxeni Panagiotopoulos Irrevocable Trust ("PP Trust") is an insider transferee or beneficiary of transfers made by Polyxeni Panagiotopoulos, including transfers concerning 54-46 46th Street and related assets. Upon information and belief, its only trustees are Spyros and Georgia. The identities of any other trustees will be amended when discovered.

25. The MP Trust and PP Trust are collectively herein called the "Trust Defendants."

26. None of the above individual defendants is a citizen of Delaware or Connecticut.

27. Besides Georgia Panagiotopoulos, all of the above defendants are citizens of New York.

28. Defendants John Doe Trustees 1-10 are trustees, successor trustees, trust protectors, nominees, or fiduciaries associated with the Trust Defendants who held or controlled transferred assets. Their identities are presently unknown.

29. Defendants John Doe Transferees 1-20 are transferees, beneficiaries, nominees, holders, or recipients of assets transferred by the judgment debtors. Their identities are presently unknown.

## JURISDICTION AND VENUE

30. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity between Plaintiff and the properly aligned defendants, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. This Court also has ancillary and supplemental jurisdiction to enforce its March 27, 2025 judgment in the Underlying Lawsuit and to adjudicate claims that are incidental to collection of that judgment.

31. The Court has personal jurisdiction over the New York residents and entity defendants because they reside, are organized, transact business, own property, or made or received transfers in the State of New York. The Court has personal jurisdiction over nonresident transferees to the extent that they received transfers from New York debtors, own or claim interests in New York property, participated in transfers affecting New York assets, or otherwise purposefully availed themselves of New York's jurisdiction.

32. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the judgment in the Underlying Lawsuit was entered in this District, several defendants reside or are located in

this District, and a substantial part of the events, omissions, assets, and transfers at issue occurred in this District.

## THE JUDGMENT AND BERKLEY'S CLAIM

33. On March 27, 2025, judgment was entered in the Underlying Lawsuit (DE 60) in favor of Berkley and against FG-PH Corp., Arista Mechanical HVAC, Inc., CEGF & G Plumbing Corp., 1815 Linden, LLC, Efstratios Georgelis, Michael Panagiotopoulos, Polyxeni Panagiotopoulos, Carlos Cassius, and Carmen Cassius (collectively hereinafter "Judgment Debtors"), jointly and severally, in the total amount of $14,452,044.22 (besides post-judgment interest thereon), consisting of $10,500,000 in damages and $3,952,044.22 in pre-judgment interest ("Judgment"). A true and genuine copy of the Judgment is attached hereto as **EXHIBIT A**, and incorporated by this reference.

34. The Judgment arose from indemnity obligations and surety losses paid by Berkley in connection with FG-PH and related bonded construction projects.

35. Berkley's claim for the money awarded existed before Judgment and before the transfers alleged below. At a minimum, Berkley held contingent, unmatured, or equitable claims when indemnity agreements were executed, bond obligations were undertaken, bonded obligations were breached or threatened, Berkley issued demands, and Berkley paid losses.

36. Berkley issued indemnity demands to the Judgment Debtors in or around March and April 2021. Several individual defendants acknowledged awareness of Berkley's demands or the underlying claims and nevertheless transferred assets or continued to dissipate assets to insiders thereafter.

37. The Judgment remains completely unsatisfied. The Judgment Debtors have not paid the Judgment and have claimed to be insolvent or undercapitalized and unable to satisfy the Judgment in full.

**GENERAL FRAUDULENT TRANSFER ALLEGATIONS**

38. The Judgment Debtors transferred assets to insiders, including spouses, children, trusts, family-controlled accounts, and related entities.

39. The Judgment Debtors received no consideration or less than reasonably equivalent value for many of the transfers alleged below.

40. The Judgment Debtors retained possession, use, control, benefits, or access to assets after transferring them, including continued occupancy of real property transferred to children, use of accounts accessed by children, payment of expenses by or through transferees, and continued influence over transferred property.

41. Several transfers were made when the debtors were insolvent, rendered insolvent, or were engaged in businesses or transactions for which remaining assets were unreasonably small.

42. The transfers were made while Berkley held claims of which the Judgment Debtors had been made aware, while the Judgment Debtors were experiencing severe business and tax problems, while FG-PH and other Judgment Debtor entities were failing or had ceased operations, while they faced substantial actual or contingent liabilities, and while the Underlying Action against them was pending.

43. The transfers were concealed, poorly documented, undocumented, or routed through family accounts, retirement accounts, cash withdrawals, international transfers, or trusts.

44. The Judgment Debtors failed to produce complete financial records and other relevant documents in response to repeated demands therefor by Berkley in the Underlying

Lawsuit, and during their depositions held on October 27 and 28, 2025, Judgment Debtors claimed not to remember material facts about transfers, accounts, sale proceeds, bank deposits, checks, and foreign property.

45. The transfers involved insider transfers, transfers for no consideration, transfers of substantially all or significant assets, retention of benefits after transfer, transfers while threatened with or subject to substantial claims, unexplained movement of funds, missing records, and post-transfer insolvency.

46. The Judgment Debtors did not provide disclosure of bank statements and other financial documents showing their fraudulent or voidable transfers until October of 2025, shortly before their depositions, and months after the document demands had been issued.

47. Spyros eventually and untimely provided some of his own financial documents in April of 2026.

48. Celeste Cassius was served by a process server with a document subpoena but never responded.

49. No one who has responded to a subpoena has provided anywhere close to all of the documents requested, and there are gaps of missing documents from the last four years.

50. As such, Berkley was not and could not have been aware of the specific fraudulent or voidable transfers alleged in this Complaint, until within the past year.

**PANAGIOTOPOULOS TRANSFERS**

51. On or about February 12, 2020, Polyxeni Panagiotopoulos ("Polyxeni") transferred the property located at 84-15 55th Avenue, Elmhurst, Queens, New York, to her daughter Georgia, for no consideration or inadequate consideration, even though Spyros was living there at the time and Georgia was not living in Greece.

52. Polyxeni testified that in 2019, prior to that transfer, she took out a $200,000.00 loan on the property at 84-15 55th Avenue, Elmhurst, Queens, New York.

53. After the transfer of 84-15 55th Avenue, Michael Panagiotopoulos ("Michael") and Polyxeni continued to live at that property, while Georgia owned or claimed to own the property and resided in Greece for some or all later periods. Michael and Polyxeni lived in the basement, while other floors were rented out.

54. Michael testified that he and Polyxeni do not pay for rent, taxes, and utilities for this residence.

55. On or about February 12, 2020, Polyxeni Panagiotopoulos transferred her interest in the property located at 84-16 55th Avenue, Elmhurst, Queens, New York, to her son Spyros, for no consideration or inadequate consideration. Upon information and belief, Spyros rents all or substantially all of the property and receives or controls rental proceeds.

56. Polyxeni regularly transferred $8,000.00 amounts from her savings to her son Spyros allegedly for payment of bills and payments on the $200,000.00 loan on the property at 84-16 55th Avenue.

57. Polyxeni transferred or caused the transfer of funds to her son Spyros, including at least the following:

a. $500.00 on August 19, 2021;

b. $9,000.00 on October 28, 2021;

c. $8,000.00 on October 27, 2022;

d. $6,000.00 on October 31, 2022;

e. $1,000.00 on April 17, 2023;

f. $1,500.00 on May 4, 2023;

g. $20,000.00 on June 5, 2023;

h. $1,000.00 on June 5, 2023;

i. $16,000.00 on June 26, 2023;

j. $30,000.00 on August 3, 2023;

k. $3,000.00 on August 7, 2023;

l. $5,000.00 on August 19, 2023;

m. $10,000.00 on September 17, 2023;

n. $5,000.00 on October 1, 2023;

o. $2,000.00 on October 3, 2023;

p. $5,000.00 on October 17, 2023;

q. $42,000.00 on October 19, 2023;

r. $50,000.00 on October 26, 2023;

s. $3,100.00 on October 30, 2023;

t. $1,000.00 on August 19, 2024; and

u. $1,000.00 on June 8, 2025.

58. On or about February 12, 2020, Michael and Polyxeni Panagiotopoulos each transferred their respective 50% ownership interests in commercial property at or associated with 54-46 46th Street, Queens, New York, to their respective trusts, with Spyros and Georgia serving as trustees, beneficiaries, nominees, or recipients.

59. The total ownership interest went 50% to Spyros and Georgia as co-trustees of the Michael Panagiotopoulos Irrevocable Trust dated 2/12/2020, and 50% to Spyros and Georgia as co-trustees of the Polyxeni Panagiotopoulos Irrevocable Trust.

60. The transfer was for no consideration or inadequate consideration.

61. Michael later transferred or caused the transfer of his interest in 54-46 46th Street to Spyros Panagiotopoulos, directly or indirectly through a trust, for no consideration or inadequate consideration.

62. As Michael testified, Michael or Polyxeni or both transferred an apartment located at 182 Brasidou, Sparta City, Greece, or other Greek real-property interests, to Georgia or Spyros or both, for no consideration or inadequate consideration.

63. Michael specifically testified that he transferred 182 Brasidou to his daughter Georgia and that she did not pay him for it.

64. Between 2019 and 2024, Michael transferred or caused the transfer of funds internationally to a business entity or individual in Greece known as Spiridon Rex, allegedly for expenses relating to a since-abandoned business venture raising rabbits for their skins on an approximately 15-acre farm. Those transfers included at least the following:

a) $5,000.00 on January 31, 2019;

b) $7,000.00 on March 28, 2019;

c) $7,000.00 on March 29, 2019;

d) $4,616.81 on May 6, 2019;

e) $9,199.63 on June 18, 2019;

f) $6,335.68 on July 8, 2019;

g) $7,932.01 on September 6, 2019;

h) $1,122.59 on September 30, 2019;

i) $21,626.82 on September 23, 2020;

j) $6,215.81 on April 26, 2021;

k) $5,615.87 on May 17, 2021;

l) $2,141.58 on October 6, 2021;

m) $2,911.04 on December 3, 2021;

n) $579.78 on December 14, 2021;

o) $7,078.21 on December 15, 2021;

p) $2,948.81 on February 4, 2022;

q) $1,476.27 on March 18, 2022;

r) $1,654.17 on June 2, 2022;

s) $1,104.73 on June 8, 2022;

t) $1,956.52 on June 16, 2022;

u) $626.11 on July 26, 2022;

v) $1,035.41 on September 9, 2022;

w) $733.68 on August 15, 2022;

x) $10,631.15 on January 30, 2023;

y) $2,013.65 on June 14, 2023;

z) $1,316.94 on March 6, 2023;

aa) $2,028.85 on June 20, 2023;

bb) $2,062.80 on July 24, 2023;

cc) $1,231.66 on August 21, 2023;

dd) $1,091.11 on September 25, 2023;

ee) $1,681.61 on January 18, 2024;

ff) $667.71 on February 22, 2024;

gg) $774.94 on May 7, 2024; and

hh) $776.57 on May 13, 2024.

65. Additionally, there were transfers to other entities in Europe for what Michael purported to be outstanding bills for food or energy from the rabbit business.

66. The transfers relating to the rabbit business extended for years after the business had closed.

67. Michael testified during his deposition on October 27, 2025, that he created a trust and transferred assets because of health problems and a desire to get assets off his name. That stated purpose is direct evidence that the transfers were designed to place assets beyond creditors' reach.

68. This was the MP Trust.

69. Michael maintained a joint checking account with Spyros, gave Spyros access to passwords and financial accounts, and allowed Spyros to pay or control Michael's expenses. These facts support an inference of continued control, concealment, and nominee ownership.

70. As Michael testified, Spyros pays for Michael's credit card.

71. Polyxeni transferred or caused repeated cash or account transfers to Spyros, including $8,000.00 transfers and other payments, and admitted that she had been giving money owed to Berkley to her son in the years since 2022, though she claimed she had stopped by the time of her deposition.

72. Polyxeni transferred approximately $20,000.00 or more to her daughter Georgia in Greece for education, marriage, or other expenses after Berkley's debt claims arose, and made other payments or transfers for Georgia's benefit.

73. Polyxeni received substantial pension or retirement proceeds, including approximately $200,000.00 to $300,000.00 after taxes, but alleges that the funds were dissipated

on bills, family expenses, Georgia's marriage, Georgia's education, credit card payments, unexplained checks, and transfers between accounts.

74. Polyxeni paid out this money throughout the past four years. For example, her daughter Georgia's marriage, for which Polyxeni provided money, was two years ago.

75. The Panagiotopoulos transfers were made to insiders, for no or inadequate consideration, while Michael and Polyxeni faced actual or contingent liabilities, and with retention of benefits and indicia of concealment.

76. The Panagiotopouloses, like the other Judgment Debtors, were made aware of Berkley's claim of their liability for this debt no later than around April of 2021 when Berkley sent demand letters to them.

**CASSIUS TRANSFERS**

77. Carlos Cassius ("Carlos") and Carmen Cassius ("Carmen") are Judgment Debtors. They jointly own or owned their home in Fresh Meadows, Queens, New York, and maintained banking relationships in New York and the Dominican Republic.

78. Carlos and Carmen transferred substantial funds to or for the benefit of their daughters Ivisdenia Cassius and Celeste Cassius, including funds used for real-property purchases, closing costs, repairs, attorneys' fees, school expenses, and other personal expenses.

79. In 2020, Carlos transferred payments to Carmen marked or described in disclosed banking statements as "Ivis gift" for the benefit of their daughter Ivisdenia Cassius ("Ivisdenia"). Upon information and belief, these funds were used to assist Ivisdenia's acquisition of real property. Those transfers included at least the following.

80. On May 1, 2020, Carlos transferred $22,0000.00 to Carmen, marked as "Ivis Gift."

81. On June 1, 2020, Carlos transferred $20,000.00 to Carmen, and Carlos did the same on June 30, 2020. The transfers were marked as "Ivis Gift," and Carmen testified that she was to give the money as a gift to Ivisdenia.

82. On July 21, 2020, Carlos transferred $11,000 to Carmen, marked as "For Closing Cost." As Carmen testified, on July 21, 2020, she paid $11,000.00 to Ivisdenia for Ivisdenia's closing costs on a house.

83. As Carmen testified, on July 23, 2020, she paid $56,000.00 to Ivisdenia, also to help her with a down payment on the house.

84. As Carmen testified, on April 30, 2021 (which was after Berkley had asserted indemnity claims), Carlos transferred $20,000.00 to Carmen, for Carmen to give to Ivisdenia again for Ivisdenia's down payment on the house.

85. Carmen transferred the money to Ivisdenia.

86. Thus, Carlos and Carmen made payments for Ivisdenia's down payment and closing costs.

87. Carmen also provided approximately $87,000.00 for Ivisdenia's acquisition of a house in Valley Stream, Nassau County, New York, including approximately $76,000.00 for the down payment and approximately $11,000.00 for closing costs.

88. Carmen also paid contractors or vendors for repairs to Ivisdenia's property, including payments of approximately $6,000.00 and $5,000.00.

89. As Carmen testified, she paid $5,000.00 on September 10, 2021, to a contractor working on Ivisdenia's house, and that Ivisdenia did not pay Carmen back.

90. As Carmen testified, she paid $6,000.00 on December 2, 2021, to a contractor working on Ivisdenia's house, and that Ivisdenia did not pay Carmen back.

91. Carmen testified that the house was bought for about $600,000.

92. Carmen paid:

a. $2,000.00 on September 28, 2023, to Ivisdenia, marked as "Wire Transfer for Closing";

b. $100.00 on October 2, 2023.

93. Ivisdenia paid no reasonably equivalent value for these transfers and did not repay Carlos or Carmen.

94. Carlos and Carmen also made voidable transfers to their daughter Celeste Cassius "Celeste").

95. On October 14, 2020, Carmen withdrew $109,520.00 from her IRA account and, on October 28, 2020, transferred $108,000.00 of the money to Celeste as a down payment for Celeste's acquisition of an apartment located at 1901 Madison Avenue, Apartment 522, New York, New York.

96. Carmen testified that the payment was a "gift," that she provided approximately $136,000.00 in total for Celeste's apartment purchase, and that the apartment's sale price was about $300,000.00.

97. In 2021, after Berkley had asserted indemnity claims, Carlos transferred or caused the transfer of funds for the Madison Avenue apartment including at least the following:

a. $2,000.00 on May 13, 2021;

b. $840.00 on May 24, 2021; and

c. $5,000.00 on September 1, 2021.

98. Carmen transferred additional funds to Celeste after Berkley's debt demands were made, including approximately $10,000.00 in April 2021, approximately $5,000.00 in May 2023

for attorneys' fees, approximately $5,000.00 in March 2024 for attorneys' fees, and approximately $3,000.00 in June 2025 for school expenses. Transfers to Celeste included at least the following:

a. $28,000.00 on October 6, 2020;

b. $108,00.00 on October 28, 2020;

c. $10,000.00 on April 7, 2021 (Carmen testified that this was to help Celeste with expenses, and that Celeste did not pay her back);

d. $600.00 on June 28, 2021;

e. $100.00 on December 27, 2021;

f. $500.00 on October 21, 2022;

g. $1,500.00 on October 24, 2022;

h. $7,000.00 on July 15, 2022;

i. $1,500.00 on January 3, 2023;

j. $5,000.00 on May 22, 2023 (Carmen testified that this was to help Ivisdenia with Ivisdenia's attorney's fees, and that it was a gift to her that she was not to pay back);

k. $2,000.00 on September 28, 2023;

l. $5,000.00 on March 25, 2024;

m. $1,000.00 on August 1, 2024; and

n. $3,000.00 on June 16, 2025 (Carmen testified that this was to help Celeste pay for Celeste's children's school).

99. Celeste paid no reasonably equivalent value for these transfers and did not repay Carlos or Carmen.

100. Carmen also transferred funds to the Dominican Republic, including a $9,000.00 transfer in December 20, 2022 (as Carmen testified, and as her bank statement reflects, this was to buy a car in the Dominican Republic), a $3,000.00 transfer on January 23, 2023, another $3,000.00 transfer on January 23, 2023, a $3,000.00 transfer on June 22, 2023, a $40,000.00 transfer on October 25, 2023 (Carmen testified that she spent all of this money), an $8,000.00 transfer on April 28, 2025 (Carmen testified that this was to repair her residence in the Dominican Republic), a $7,200.00 payment on April 30, 2025 (Carmen testified that this was to give to her daughters, with $2,000.00 specified as going to Ivisdenia) and other wire transfers, and maintains or maintained a joint BHD Bank account in Santo Domingo with Carlos. Upon information and belief, these transfers were made while the Judgment Debtors were insolvent or unable to satisfy Berkley's claim and were designed to hinder, delay, or defraud Berkley or place assets beyond execution.

101. Carmen transferred funds to an individual friend Rudy Santana without written promissory notes, interest, or meaningful documentation, including a $10,000.00 transfer on August 10, 2023, and a $1,633.00 transfer in January 2025. Berkley alleges these transfers as part of a broader pattern of undocumented insider or relationship-based transfers and reserves the right to add Rudy Santana or other transferees as defendants after discovery.

102. Rudy Santana ("Rudy") was a friend of Carlos, as Carlos and Carmen have testified.

103. Carlos testified in October of 2025 that Carmen provided Rudy with loans, which Rudy had not paid back. Carmen testified that Rudy paid no interest on the loan.

104. Carlos also testified that he was aware that his wife regularly sent money to a bank account in the Dominican Republic jointly owned by Carlos and Carmen.

105. Carlos also transferred funds to Rudy, including, for example, a transfer of $5,000.00 on March 8, 2023, $1,000.00 on January 9, 2024, and $2,000.00 on January 10, 2024.

106. Carmen also transferred $40,000.00 to Carlos on September 26, 2022. She testified that this was to help Carlos pay for his supposed expenses, and that she did not question what he wanted the money for.

107. Carmen made other transfers to Carlos as well, including a $10,000.00 transfer to Carlos on December 21, 2021.

108. On January 8, 2021, Carlos transferred $25,000.00 to Carmen.

109. The Cassius transfers were made to insiders, for no or inadequate consideration, while Berkley held claims and while Carlos and Carmen were or expected to become unable to pay Berkley. The transfers include payments after Carmen received Berkley's April 2021 demand and after judgment was entered.

110. Likewise, Carlos and Carmen, according to the financial documents that they have disclosed, have made similar payments for restaurants, utilities, and video games, instead of paying Berkley.

111. They also withdrew cash from their bank account and used it for sundry expenses, and for their grandchildren, as Carmen has testified.

**GEORGELIS AND ENTITY ASSET ALLEGATIONS**

112. Efstratios Georgelis (also known as Charlie), FG-PH, CEGF & G, Arista, and 1815 Linden are Judgment Debtors. Upon information and belief, they owned or controlled interests in real property, entity interests, bank accounts, accounts receivable, rents, equipment, insurance, tax refunds, and other assets subject to execution.

113. Efstratios Georgelis testified and admitted during his deposition on October 27, 2025, that he had no bank account after taxing authorities closed accounts, was working for cash or cashing paychecks, lived rent-free, held retirement assets, and held interests in the 1815 Linden property and a property at 1240 (also known as 1240-1250) Edward L. Grant Highway, Bronx County, New York (the "Edward L. Grant Property"), through FG-PH Development or related entities.

114. 1815 Linden has received tenant rents and has had bank accounts or records controlled by insiders. Carlos Cassius collected rent by Venmo, deposited rents into a personal account, and transferred rent funds to a corporate account while Efstratios Georgelis controlled or possessed LLC records.

115. FG-PH and related entities had unexplained deposits, transfers, bank account withdrawals, payments to or for unrelated properties, and incomplete records. Upon information and belief, some assets or proceeds of these entities were transferred to insiders, related entities, or unknown transferees without fair value.

116. Efstratios Georgelis transferred or caused the transfers of millions of dollars from the FG-PH company account, which transfers he has failed to justify, including at least the following transactions in 2020:

a. $2,500.00 to checking account ending 2558 on January 6, 2020;

b. $20,000.00 to checking account ending 2558 on January 7, 2020;

c. $5,000.00 to checking account ending 2558 on January 8, 2020;

d. $5,000.00 to checking account ending 2558 January 9, 2020;

e. $20,000.00 to checking account ending 2558 on January 9, 2020;

f. $20,000.00 to checking account ending 2558 on January 17, 2020;

g. $10,000.00 to checking account ending 2558 on January 23, 2020;

h. $50,000.00 to checking account ending 2558 on February 6, 2020;

i. $10,000.00 to checking account ending 2558 on February 18, 2020;

j. $60,000.00 to checking account ending 2558 on February 26, 2020;

k. $10,000.00 to checking account ending 2558 on April 2, 2020;

l. $20,000.00 to checking account ending 2558 on April 6, 2020;

m. $10,000.00 to checking account ending 2558 on April 8, 2020;

n. A second $10,000.00 transfer to checking account ending 2558 on April 8, 2020;

o. $12,000.00 to checking account ending 2558 on April 29, 2020;

p. $10,000.00 to checking account ending 2558 on May 7, 2020;

q. $10,000.00 to checking account ending 2558 on May 13, 2020;

r. $10,000.00 to checking account ending 2558 on May 19, 2020;

s. $10,000.00 to checking account ending 2558 on May 22, 2020;

t. $10,000.00 to checking account ending 2558 on May 29, 2020;

u. $10,000.00 to checking account ending 2558 on June 2, 2020;

v. $10,000.00 to checking account ending 2558 on June 5, 2020;

w. $5,000.00 to checking account ending 2558 on June 11, 2020;

x. $10,000.00 to checking account ending 2558 on June 12, 2020;

y. $10,000.00 to checking account ending 2558 on June 18, 2020;

z. $5,000.00 to checking account ending 2558 on June 26, 2020;

aa. $3,000.00 to checking account ending 2558 on June 26, 2020;

bb. $5,000.00 to checking account ending 2558 on Jue 30, 2020;

cc. $25,000.00 to checking account ending 2558 on July 10, 2020;

dd. $5,000.00 to checking account ending 2558 on July 14, 2020;

ee. $7,000.00 to checking account ending 2558 on July 17, 2020;

ff. $5,000.00 to checking account ending 2558 on July 20, 2020;

gg. $10,000.00 to checking account ending 2558 on July 21, 2020;

hh. $5,000.00 to checking account ending 2558 on July 27, 2020;

ii. $10,000.00 to checking account ending 2558 on July 28, 2020;

jj. $10,000.00 to checking account ending 2558 on July 30, 2020;

kk. $2,000.00 to checking account ending 2558 on August 3, 2020;

ll. $5,000.00 to checking account ending 2558 on August 3, 2020;

mm. $10,000.00 to checking account ending 2558 on August 6, 2020;

nn. A second transfer of $10,000.00 to checking account ending 2558 on August 6, 2020;

oo. $5,000.00 to checking account ending 2558 on August 6, 2020;

pp. $10,000.00 to checking account ending 2558 on August 12, 2020;

qq. $10,000.00 to checking account ending 2558 on August 14, 2020;

rr. $15,000.00 to checking account ending 2558 on August 27, 2020;

ss. $10,000.00 to checking account ending 2558 on September 4, 2020;

tt. $10,000.00 to checking account ending 2558 on September 8, 2020;

uu. $5,000.00 to checking account ending 2558 on September 9, 2020;

vv. $2,500.00 to checking account ending 2558 on September 9, 2020;

ww. $2,500.00 to checking account ending 2558 on September 11, 2020;

xx. $10,000.00 to checking account ending 2558 on September 11, 2020;

yy. $5,000.00 to checking account ending 2558 on September 24, 2020;

zz. $20,000.00 to checking account ending 2558 on September 25, 2020;

aaa. $1,000.00 to checking account ending 2558 on September 30, 2020;

bbb. $10,000.00 to checking account ending 2558 on October 9, 2020;

ccc. $10,000.00 to checking account ending 2558 on October 20, 2020;

ddd. $10,000.00 to checking account ending 2558 on November 10, 2020;

eee. $30,000.00 to checking account ending 2558 on November 12, 2020;

fff. $50,000.00 to checking account ending 2558 on November 16, 2020;

ggg. $60,000.00 to checking account ending 2558 on November 16, 2020;

hhh. $25,000.00 to checking account ending 2558 on November 20, 2020;

iii. $20,000.00 to checking account ending 2558 on November 20, 2020;

jjj. $30,000.00 to checking account ending 2558 on November 24, 2020;

kkk. $220,000.00 to checking account ending 2558 on November 25, 2020;

lll. $33,000.00 to checking account ending 2558 on December 1, 2020;

mmm. $4,000.00 to checking account ending 2558 on December 1, 2020;

nnn. $3,000.00 to checking account ending 2558 on December 1, 2020;

ooo. $30,000.00 to checking account ending 2558 on December 8, 2020;

ppp. $6,000.00 to checking account ending 2558 on December 22, 2020;

qqq. $6,000.00 to checking account ending 2558 on December 24, 2020;

rrr. $2,700.00 to checking account ending 2558 on December 28, 2020; and

sss. $200,000.00 to checking account ending 2558 on December 30, 2020.

117. Efstratios Georgelis transferred or caused the transfer of funds from FG-PH to other accounts in 2020, including several transfers for which he cannot identify the account holder or the reason for the transfers. Those transfers included at least the following:

a. $2,500.00 to checking account ending 6716 on January 2, 2020;

b. $5,000.00 to checking account ending 6716 on January 2, 2020;

c. $25,000.00 to checking account ending 6716 on January 3, 2020;

d. $35,000.00 to checking account ending 6716 on January 7, 2020;

e. $3,000.00 to checking account ending 6716 on January 14, 2020;

f. A second transfer of $3,000.00 to checking account ending 6716 on January 14, 2020;

g. $18,000.00 to checking account ending 6716 on January 16, 2020;

h. $5,000.00 to checking account ending 6716 on January 21, 2020;

i. $7,500.00 to checking account ending 6716 on January 22, 2020;

j. $40,000.00 to checking account ending 6716 on January 23, 2020;

k. $10,000.00 to checking account ending 6716 on January 28, 2020;

l. $2,000.00 to checking account ending 6716 on February 3, 2020;

m. $1,000.00 to checking account ending 6726 on February 3, 2020;

n. $110,000.00 to checking account ending 6716 on February 6, 2020;

o. $20,000.00 to checking account ending 6716 on February 11, 2020;

p. $35,000.00 to checking account ending 6716 on February 11, 2020; and

q. $30,000.00 to checking account ending 6716 on February 18, 2020.

118. Efstratios Georgelis caused the reversal of eight checks on or about January 30, 2020. Those checks lack any description and Efstratios Georgelis cannot explain the reasons for reversal of those checks from FG-PH, which were made in the following amounts:

a. Check 5140 for $60,000.00;

b. Check 5120 for $5,676.50;

c. Check 5173 for $1,500.00;

d. Check 5164 for $1,248.51;

e. Check 5165 for $559.72;

f. Check 5167 for 388.59;

g. Check 5163 for $265.48; and

h. Check 5161 for $81.36.

119. In March 2020, Efstratios Georgelis caused the reversal of four transfers totaling $290,000.00 that he has failed to explain.

120. On or about May 15, 2020, Efstratios Georgelis transferred funds from the FG-PH account to a personal joint account with his sister, Joanne Georgelis, in the amounts of $1,000.00, and $199,200.00.

121. Approximately $2,000,000 distributed by the owner of the project that Berkley bonded (which is the project that ultimately triggered the Underlying Lawsuit) went into an account controlled by FG-PH instead of being used to pay Berkley.

122. FG-PH and other Judgment Debtors used these funds to invest in the Edward L. Grant Property Bronx property via transfer to 1240 Edward Grant LLC, a New York limited-liability company that the Judgment Debtors established.

123. Efstratios Georgelis testified that he invested two million dollars from FG-PH in the purchase of the Edward L. Grant Property, along with an Archbishop Alexander who invested separately and who had been the prior lessee at the property.

124. 1240 Edward Grant LLC obtained sole ownership of the Edward L. Grant Property by deed on December 10, 2020 (recorded on December 29, 2020).

125. FG-PH or other Judgment Debtors thus acquired an ownership or possessory interest in the Edward L. Grant Property, or in the company that owns it.

126. This interest is effectively the proceeds of a fraudulent transfer, the Judgment Debtors' misuse of the $2,000,000 by paying for this interest rather than paying Berkley to satisfy their debt to Berkley.

127. Berkley thus seeks turnover of that interest, among other remedies sought.

128. Additionally, the FG-PH funds that were transferred and used as described herein, including to purchase the ownership interest in the Edward L. Grant Property were, upon information and belief, received by FG-PH as a contractor under a contract for improvement of real property and were required under New York law to be held in trust for the benefit of the beneficiaries as identified under New York law, the transfers and uses as described above are a misappropriate of trust funds under New York law.

129. Berkley reserves the right to amend this Complaint to identify additional transferees, transfers, accounts, trusts, nominees, and property after discovery.

130. Berkley has met or substantially met all conditions precedent for filing this lawsuit, or any conditions precedent to filing this lawsuit have been excused.

## COUNT I – ACTUAL FRAUDULENT CONVEYANCES OR VOIDABLE TRANSFERS (NEW YORK DEBTOR AND CREDITOR LAW § 273(a)(1) AND FORMER § 276) (Against All Defendants)

131. Berkley repeats and realleges the preceding paragraphs as if fully set forth herein.

132. To the extent that any challenged transfer occurred before April 4, 2020, the transfer is avoidable under former New York Debtor and Creditor Law § 276 because it was made with actual intent to hinder, delay, or defraud present or future judgment creditor Berkley.

133. To the extent that any challenged transfer occurred on or after April 4, 2020, the transfer is voidable under New York Debtor and Creditor Law § 273(a)(1) because it was made with actual intent to hinder, delay, or defraud present or future judgment creditor Berkley.

134. The transfers alleged herein include transfers to insiders; transfers for no or inadequate consideration; transfers of significant assets; retention of possession, occupancy, control, or benefits; transfers in anticipation of or after creditor claims or the initiation of a civil action asserting those claims; concealment and missing records; insolvency or inability to pay debts; and unusual movement of assets through trusts, family accounts, cash, and foreign accounts.

135. Discovery of the fraudulent transfers discussed herein was not possible until the time of Judgment Debtors' depositions on October 27 and 28, 2025, and the document productions that they belatedly made around that time pursuant to document demands that had been issued in pursuance of execution of the Judgment, and the document productions that Spyros made in response to subsequent subpoenas, in the first half of 2026.

136. The Judgment Debtors made their transfers while they were aware, or should have been aware, that they owed Berkley such a large sum of money as is reflected in the judgment ultimately entered against them in the Underlying Lawsuit.

137. The Judgment Debtors had been served with Berkley's debt demand around March or April of 2021, they were served with summonses of a lawsuit against them around April of 2022, and they answered the complaint therein in May of 2022.

138. Even before receiving the demand letters, the Judgment Debtors were aware of the loan made with Berkley's involvement, for which they would be responsible if they did not pay it back.

139. The Judgment Debtors knew that none of them had paid it back.

140. In particular, each Judgment Debtor knew that neither he or it individually, nor any other Judgment Debtor, nor anyone else, had paid it back.

141. The Judgment Debtors were aware that the business entities among them were no longer operating from about 2022 onwards.

142. The Judgment Debtors were aware that they held large personal debts independent of the Berkley debt.

143. The Judgment Debtors transferred large amounts of money, and ownership of high-value assets including real estate, to insiders, family members, and friends, including overseas to Greece and the Dominican Republic.

144. The Judgment Debtors did so in substantial part to put the value out of reach of their creditors, including their biggest creditor Berkley.

145. They thus intended to, and did, hinder and delay Berkley's recovery of the Judgment Debtors' debt to Berkley.

146. The other defendants were among the recipients of the Judgment Debtors' fraudulent or voidable transfers.

147. Berkley is entitled to avoidance of the transfers, and attachment, injunction, receivership, levy, turnover, money judgments against transferees and beneficiaries, attorneys' fees, costs, and other relief.

## COUNT II – CONSTRUCTIVE FRAUDULENT CONVEYANCES OR TRANSFERS FOR LESS THAN FAIR VALUE (§ 273(a)(2) AND ITS FORMER ANALOGUE)

**(Against All Defendants)**

148. Berkley repeats and realleges the preceding paragraphs as if fully set forth herein.

149. To the extent that any challenged transfer occurred before April 4, 2020, the transfer is avoidable under former New York Debtor and Creditor Law §§ 273, 274, and 275 because the participating defendant made the transfer without fair consideration and was insolvent, was rendered insolvent, was prospectively insolvent, was left with unreasonably small capital for business, or intended or believed debts would be incurred beyond the defendant's ability to pay.

150. To the extent that any challenged transfer occurred on or after April 4, 2020, the transfer is voidable under New York Debtor and Creditor Law § 273(a)(2) because the participating defendant did not receive reasonably equivalent value and was engaged or about to engage in business or transactions for which remaining assets were unreasonably small, or intended to incur or reasonably should have believed that the defendant would incur debts beyond the defendant's ability to pay as they became due.

151. The transfers to Spyros, Georgia, Ivisdenia, Celeste, and the Trust Defendants were made for no consideration or less than reasonably equivalent value, and the Judgment Debtors were insolvent, became insolvent, or were left undercapitalized and unable to satisfy Berkley's claims.

152. Discovery of the fraudulent transfers discussed herein was not possible until the time of Judgment Debtors' depositions on October 27 and 28, 2025, and the document productions that they belatedly made around that time pursuant to document demands that had been issued in pursuance of execution of the Judgment, and the document productions that Spyros made in response to subsequent subpoenas, in the first half of 2026.

153. The Judgment Debtors made their transfers while they were aware, or should have been aware, that they owed Berkley such a large sum of money as is reflected in the judgment ultimately entered against them in the Underlying Lawsuit.

154. They had been served with Berkley's debt demand around March or April of 2021, they were served with summonses of a lawsuit against them around April of 2022, and they answered the complaint therein in May of 2022.

155. Even before receiving the demand letters, the Judgment Debtors were aware of the loan made with Berkley's involvement, for which they would be responsible if they did not pay it back.

156. The Judgment Debtors knew that none of them had paid it back.

157. In particular, each Judgment Debtor knew that neither he or it individually, nor any other Judgment Debtor, nor anyone else, had paid it back.

158. The Judgment Debtors were aware that the business entities among them were no longer operating from about 2022 onwards.

159. The Judgment Debtors were aware that they held large personal debts independent of the Berkley debt.

160. The Judgment Debtors transferred large amounts of money, and ownership of high-value assets including real estate, to insiders, family members, and friends, including overseas to Greece and the Dominican Republic.

161. Michael and Polyxeni Panagiotopoulos were retired and making practically no income, and, so lacking money to pay their debts, they took out a loan on their house in order to pay their bills including credit card bills, which they are still paying off.

162. The Judgment Debtors thus made their transfers while already insolvent or expecting to become insolvent.

163. The other defendants were among the recipients of the Judgment Debtors' fraudulent or voidable transfers.

164. Berkley is entitled to avoidance, recovery, money judgments, and all remedies available under New York law.

**COUNT III – TRANSFERS VOIDABLE AS TO PRESENT CREDITOR**
**(§ 274(a))**
**(Against All Defendants)**

165. Berkley repeats and realleges the preceding paragraphs as if fully set forth herein.

166. Berkley's claims arose before many of the transfers alleged herein, including transfers made after Berkley's March and April 2021 demands, after commencement of the underlying action, and after entry of judgment.

167. Transfers made by Judgment Debtors after Berkley's claims arose, without reasonably equivalent value, and while the debtors were insolvent or rendered insolvent, are voidable as to Berkley under New York Debtor and Creditor Law § 274(a).

168. The Judgment Debtors made numerous transfers to others of money and real estate, including all of the other defendants herein, entirely without return consideration or repayment, or, in the event of loans given, without demanding interest, as alleged above.

169. Discovery of the fraudulent transfers discussed herein was not possible until the time of Judgment Debtors' depositions on October 27 and 28, 2025, and the document productions that they belatedly made around that time pursuant to document demands that had been issued in pursuance of execution of the Judgment, and the document productions that Spyros made in response to subsequent subpoenas, in the first half of 2026.

170. The defendants besides Judgment Debtors were among the recipients of the Judgment Debtors' fraudulent or voidable transfers.

171. Berkley is entitled to avoidance and recovery of these present-creditor transfers and related proceeds.

**COUNT IV – CONSTRUCTUVE FRAUDULENT OR VOIDABLE TRANSFERS TO INSIDERS**
**(§ 274(b))**
**(Against All Defendants)**

172. Berkley repeats and realleges Count III and the paragraphs preceding Count I as if fully set forth herein.

173. To the extent that transfers from the Judgment Debtors to other parties were for an antecedent debt, such transfers were made to insider family members or friends or business partners as previously alleged, while the transferors were insolvent or expected to become insolvent.

174. The defendants besides Judgment Debtors were among the recipients of the Judgment Debtors' fraudulent or voidable transfers.

175. Berkley is entitled to avoidance and recovery of these present-creditor transfers and related proceeds.

**COUNT V – RECOVERY FROM TRANSFEREES, BENEFICIARIES, TRUSTEES, AND NOMINEES**
**(NEW YORK DEBTOR AND CREDITOR LAW § 276; CPLR ARTICLE 52; EQUITABLE RELIEF)**
**(Against All Defendants)**

176. Berkley repeats and realleges the preceding paragraphs as if fully set forth herein.

177. Spyros Panagiotopoulos, Georgia Panagiotopoulos Karagounis, Ivisdenia Cassius, Celeste Cassius, the Trust Defendants, the John Doe Trustees, and the John Doe Transferees are

initial transferees, subsequent transferees, beneficiaries, trustees, nominees, holders, or persons for whose benefit transfers were made.

178. Discovery of the fraudulent transfers discussed herein was not possible until the time of Judgment Debtors' depositions on October 27 and 28, 2025, and the document productions that they belatedly made around that time pursuant to document demands that had been issued in pursuance of execution of the Judgment, and the document productions that Spyros made in response to subsequent subpoenas, in the first half of 2026.

179. Berkley is entitled to recover from each transferee, beneficiary, trustee, or nominee the transferred property or the value of the property transferred, plus proceeds, rents, profits, appreciation, interest, and other benefits received.

180. Berkley is entitled to an accounting of all assets received, held, sold, encumbered, rented, transferred, or otherwise disposed of by the transferee defendants, including real property, trust property, bank accounts, rental income, sale proceeds, foreign accounts, retirement proceeds, and cash.

181. Berkley is entitled to preliminary and permanent injunctive relief prohibiting further transfer, encumbrance, dissipation, concealment, or removal of assets, and to appointment of a receiver or other equitable remedy as necessary to preserve assets for execution.

**COUNT VI – ATTORNEYS' FEES AND COSTS**
**(NEW YORK DEBTOR AND CREDITOR LAW § 276-a AND EQUITABLE AUTHORITY)**
**(Against All Defendants)**

182. Berkley repeats and realleges the preceding paragraphs as if fully set forth herein.

183. The challenged transfers were made with actual intent to hinder, delay, or defraud Berkley and other creditors, or otherwise meet the requirements for an award of attorneys' fees under New York Debtor and Creditor Law § 276-a and applicable law.

184. Berkley is entitled to recover its reasonable attorneys' fees, costs, disbursements, and expenses incurred in investigating, prosecuting, and collecting upon the judgment and this action.

**PRAYER FOR RELIEF**

A. Avoiding and setting aside the fraudulent conveyances and voidable transfers alleged herein to the extent necessary to satisfy Berkley's judgment;

B. Entering judgment against transferees, beneficiaries, trustees, nominees, and recipients for the value of property, funds, rents, profits, appreciation, proceeds, and benefits received, together with pre-judgment and post-judgment interest;

C. Ordering turnover of transferred property and proceeds, including real property interests (including any interest in the Edward L. Grant Property), interests in companies that control real property (including any interest in the company that owns the Edward L. Grant Property), sale proceeds, rental income, trust assets, cash, bank accounts, foreign-account funds, and other assets traceable to the transfers;

D. Imposing constructive trusts, equitable liens, attachment, receivership, or other equitable remedies over transferred assets and proceeds;

E. Directing an accounting by all defendants of assets transferred, received, held, sold, encumbered, rented, dissipated, or otherwise disposed of by the defendants, including real property, trust property, bank accounts, rental income, sale proceeds, foreign accounts, retirement proceeds, and cash;

F. Preliminarily and permanently enjoining defendants, and all persons acting in concert with them, from transferring, encumbering, dissipating, concealing, moving, or disposing of assets

or proceeds subject to Berkley's claims and to appointment of a receiver or other equitable remedy as necessary to preserve assets for execution;

G. Awarding Berkley its attorneys' fees pursuant to New York Debtor and Creditor Law § 276-a or otherwise, plus costs, disbursements, and expenses in investigating, prosecuting, and collecting upon the judgment and this action;

H. Awarding pre-judgment and post-judgment interest to the fullest extent allowed by law; and

I. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Berkley demands a trial by jury on all issues so triable as of right.

Dated: September 14, 2026

Respectfully submitted,

Adam Wiener

MAZZOLA LINDSTROM LLP
Adam Wiener
1350 Avenue of the Americas, Second Floor
New York, New York 10019
Telephone: (732) 947-9111
adam@mazzolalindstrom.com

Attorneys for Plaintiff Berkley Insurance Company